IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 10, 2015 Session

## ANIL CONSTRUCTION INC. v. PATRICK D. MCCOLLUM, ET AL.

### Appeal from the Chancery Court for Madison County

### No. 67465    William B. Acree, Judge

_____

### No. W2014-01979-COA-R3-CV – Filed July 15, 2015

_____

This is the second appeal of a case involving the alleged breach of a construction contract. The plaintiff general contractor hired the defendant subcontractor to build and install cabinetry for a movie theater. The subcontract provided that the work should be completed by the date the theater was scheduled to open. However, at the theater's opening, several items remained unfinished. The general contractor refused to pay despite the subcontractor's demand for payment. The general contractor filed suit alleging breach of contract for failure to complete the project in a timely manner and for defective work. The subcontractor counterclaimed for breach of contract for failure to pay under the contract. After a bench trial, the trial court found in favor of the subcontractor and awarded damages. The general contractor now appeals. Discerning no error, we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the Court, in which ARNOLD B. GOLDIN, J., and KENNY ARMSTRONG, J., joined.

Adam M. Nahmias, Memphis, Tennessee, for the appellants, Anil Construction, Inc.

Jon A. York, Jackson, Tennessee, for the appellee, Patrick David McCollum.

### OPINION

**Background**

This is the second appeal in this case involving an alleged breach of a construction contract. Accordingly, we take many of the facts from our prior Opinion, ***Anil Construction, Inc. v. Patrick D. McCollum, Individually and d/b/a Pat's Custom Cabinets***, No. W2013-01447-COA-R3-CV, 2014 WL 3928726 (Tenn. Ct. App. Aug. 7, 2014) ("***Anil Construction I***").

Ambarish Keshani is in the business of owning and operating movie theaters. ***Id.*** at *2. Mr. Keshani uses his own construction company, Plaintiff/Appellant Anil Construction, Inc. ("Anil Construction") to build the movie theaters. ***Id.*** Anil Construction operates as a general contractor and enters into contracts with subcontractors to complete various aspects of his theaters. *See **id.***

As stated in ***Anil Construction I***,

> Mr. Keshani, through Anil Construction, began construction on a new movie theater in Jackson, Tennessee, the Cinema Planet 10 ("Cinema 10"). On April 13, 2010, Anil Construction executed a contract with subcontractor Defendant/Appellee Patrick McCollum, d/b/a Pat's Custom Cabinets ("Mr. McCollum"), for Mr. McCollum to build all of the cabinetry for the Cinema 10. The contract detailed the seven specific areas in Cinema 10 where Mr. McCollum was to install cabinets. In return, the parties agreed, Anil Construction would pay Mr. McCollum a total contract price of $44,650—half ($22,325) upon execution of the contract, and the other half 15 days after completion of the cabinet project. The contract describes the cabinet work as a "turn-key" job, that is, both parties anticipated that the subcontractor would complete the entire project. The contract also stated that the job needed to be completed by the scheduled opening of the theater in June 2010, and that time was of the essence:
>
> > Opening of [the] movie theatre in June, 2010 (Tentative date being June 11 but could move one or two weeks) is critical to Anil Construction Inc[.] and Pat's Cabinet understands that clearly and agrees to accommodate Anil Construction as needed.... Time is of an essence.

Construction of the movie theater did not go as planned. *Id.* Cinema 10 did not open in June 2010 as stated in the parties' contract. *Id.* The opening was delayed until October 1, 2010, for reasons that the parties dispute. Additionally, the cabinetry was not completed, even at the delayed October 1, 2010, opening of Cinema 10. Regarding this delay,

> [t]he record contains various email communications between the parties regarding the delay. In many of them, Mr. Keshani is urging Mr. McCollum to complete the job; in others, Mr. McCollum is pressing Mr. Keshani to pay him the balance owed on the contract. Mr. Keshani asserted that the delays in completion were caused by Mr. McCollum. Mr. McCollum in turn maintained that the delays were caused by factors outside of his control. Mr. McCollum would later testify at trial that the cabinetry work was installed and in use by October 12, 2010.
>
> In November 2010, Mr. Keshani sent emails to Mr. McCollum accusing him of taking items from the Cinema 10 that he was not authorized to take.

*Id.* at \*2–\*3. In Mr. Keshani's email of November 16, 2010, he included a list of fifteen allegedly defective items ("Items 1 through 15") that he asked Mr. McCollum to correct or complete. As provided in Mr. Keshani's email to Mr. McCollum, Items 1 through 15 include:

> (1) Bar back wall shacks [sic] when swing door is used. Still does.
>
> (2) Formica in concession/bar area coming loose at spots.
>
> (3) Bar top flips still not corrected properly to sit on top of the bar counter and now hinges are bent.
>
> (4) Bar Top flips are not square with bar. Still are not.
>
> (5) Glass shelf does not support the weight of the liquor bottles. Still exist. You are saying to put wood on each side of shelf, while your man Jimmy told me, when has was at Cinema that, it would not help. He thought the solution was to put support in the middle of each shelf. Which one of you is correct? We just want it to be able to hold the liquor bottles, at the same look good and be practical in use without hindrance.

3

(6) Liquor Cabinet is not level/plum this is evident when looking at the mirror on the right side of the cabinet. This may be because the back bar top is sagging on the left. Still exist.

(7) White piece of wood is exposed below Formica – close to the center. Still exist.

(8) Foot rail in front of the bar sits off the floor in couple places. [S]till exist.

(9) Formica – many places have damaged edges due to filing – poor work. Still exist.

(10) Waves are evident in the front of concession Formica and poor joints. Jimmy put putty in joints but does not match with color and in time it will disappear. [N]eeds proper solution.

(11) TV poles are mounted now, but the left one is not sitting level and tight on top of counter and sways. This is risky and creates liability.

(12) Still have issues with many cabinet locks.

(13) Trash can's [sic] enclosures sway door does not swing properly. Sticks due to clearance.

(14) Bar front does not have rope light groove at bottom. Your offering to hang rope light does not solve the issue. There should be groove at bottom, just like at top.

(15) Concession still dont [sic] have toe kick in front.

Mr. Keshani stated that he would not pay Mr. McCollum until these items were complete. Additionally, Mr. Keshani

> forbade Mr. McCollum from going onto the theater property without arranging it in advance in writing with Mr. Keshani personally. Mr. Keshani told Mr. McCollum that he did not consider the job to be complete until all of the listed items were done, and he made it clear that he would not pay the balance of the contracted fee until all of them were resolved.
>
> In an effort to address their disagreement, Mr. Keshani and Mr. McCollum had a face-to-face meeting on November 23, 2010. It did not go well. Mr. Keshani emphasized the items

4

that still needed to be resolved, and Mr. McCollum insisted on getting payment from Mr. Keshani. According to Mr. Keshani, the meeting culminated in Mr. McCollum threatening him with bodily harm.

After that, both sides threatened legal action. On December 1, 2010, Mr. Keshani emailed Mr. McCollum that he would pay Mr. McCollum the contract balance "[o]nce you complete all of the remaining items." The email added: "This is my final attempt before proceeding with legal action . . . ." Two days later, Mr. McCollum's attorney sent Mr. Keshani a letter demanding payment under the contract for work completed. If Mr. Keshani failed to respond by December 24, 2010, the letter said, Mr. McCollum would pursue legal action.

*Id.* at *2–*3.

Several months after the theater's delayed opening in October, on December 16, 2010, Anil Construction filed suit in the Chancery Court of Madison County against Mr. McCollum, individually and d/b/a Pat's Custom Cabinets. *Id.* at *3. Anil Construction's complaint alleged that Mr. McCollum failed to complete the cabinets in a timely and workmanlike manner. Anil Construction sought damages "in an amount to be proven at trial." As stated in ***Anil Construction I***:

Mr. McCollum responded by filing a counterclaim for the balance due under the contract. This prompted numerous affirmative defenses. Anil Construction's initial answer to the counterclaim asserted the affirmative defense of first-to-breach, claiming that Mr. McCollum was barred from recovery because he first breached the contract. Anil Construction later amended its answer to the counterclaim to include the affirmative defenses of set-off, recoupment, and duress. Discovery ensued.

*Id.* at *3.

On March 11, 2013, the trial court conducted a bench trial. The trial court heard testimony from several witnesses, including Mr. Keshani; George Bedocs, a construction expert; and Mr. McCollum. Mr. Keshani testified first:

He said that, in the beginning of the Cinema 10 project, he worked primarily with Mr. McCollum's employee, Jimmy Lloyd. Mr. Lloyd assured Mr. Keshani that the cabinets would be completed and ready to install by the end of July 2010. This proved not to be true. The delay with the cabinets,

5

Mr. Keshani said, kept other trades from completing their portions of the movie theater project, such as the electric work, the tiling, and the plumbing.

Mr. Keshani testified that, on August 20, 2010, he emailed Mr. McCollum to relay his concern about the continued delays. The email stressed that Mr. McCollum's tardiness in completing the cabinetry was "causing serious delays in our opening." In his response, Mr. McCollum asked for certain information from Mr. Keshani, but assured Mr. Keshani that he would continue to work on the cabinetry "in full force until completed." Shortly after that, on August 23, 2010, the parties signed a "Memorandum of Understanding" that outlined minor changes to the contract and, consistent with Mr. McCollum's email, said that Mr. McCollum would "put full force to complete the job." At that time, Mr. Keshani testified, the Cinema 10 was ready for installation of the cabinets. Despite all of this, Mr. McCollum did not complete the cabinets.

On September 1, 2010, Mr. Keshani emailed Mr. McCollum to inform him that he planned to open the Cinema 10 on September 10 and to press him to complete the cabinets. The email said that, at that stage in construction, Mr. Keshani "had very large daily interest charges on daily basis, and I cannot afford delay." A week later, on September 7, Mr. Keshani sent another email to Mr. McCollum listing the uncompleted items that were hindering the September 10 theater opening. The missing or incomplete items included trash cans, a liquor cabinet, a bar counter top, doors for the bar, and a door for the concession stand. Mr. Keshani testified that he tried to call Mr. McCollum, to no avail. Mr. McCollum did not return his telephone calls and did not respond to his email listing the uncompleted items. The cabinetry work was not completed and the theater did not open on September 10.

Mr. Keshani testified that he went to Mr. McCollum's cabinet shop and saw an employee working on a different project. The employee told Mr. Keshani that Mr. McCollum had instructed him to work on the other customer's job. On another occasion, Mr. Keshani said, when Mr. McCollum had assured him that he was working on the Cinema 10 project,

6

Mr. Keshani went to the cabinet shop to check[,] and Mr. McCollum turned Mr. Keshani away at the door.

Finally, despite the fact that the cabinetry was still not complete, Mr. Keshani opened the Cinema 10 on October 1, 2010. In an October 6, 2010 email to Mr. McCollum, Mr. Keshani confirmed their telephone conversation in which Mr. Keshani agreed to pay $200 for a television mount and Mr. McCollum agreed to complete the installation of the cabinets by October 12, 2010. October 12 came and went, Mr. Keshani said, and the cabinet work was not completed.

Over the next few weeks, Mr. Keshani said, Mr. McCollum's employees worked at the Cinema 10 for brief periods, addressing the unresolved cabinet work. In the course of doing so, Mr. McCollum's employees took necessary items out of the movie theater, ostensibly to work on them. The items taken out of the theater included trash cans, steel poles, and glass doors. All the while, the Cinema 10 was in operation.

Mr. Keshani testified that he refused to pay Mr. McCollum the remainder of the contract price because he did not complete the job. On November 15, 2010, Mr. Keshani sent an email to Mr. McCollum listing 15 items that would have to be resolved before he would consider the job complete. This email was entered into evidence as Exhibit 21. Item number 15 on the list said that the cabinetry on the concession stand did not have a toe kick on the customer side.[1] Mr. Keshani acknowledged that the contract did not mention a toe kick, but insisted that toe kicks are standard in the industry for that type of cabinet and should have been included in the Cinema 10's concession stand. He said that he had never seen a concession stand without a toe kick in the front and in the back as well. Referring to the list of uncompleted items in Exhibit 21, the trial judge asked Mr. Keshani, "Is this basically a punch list or is this items that have not been done at all?" Mr. Keshani responded, "[I]t includes both."

---

[1] A "toe kick," also called a "toe space," is a four-to six-inch gap at the bottom of a cabinet, at the floor level. The toe kick allows a person to stand next to the cabinet without hitting their toes on the cabinet, by giving room for the person's toes to go into the space under the cabinet.

Mr. Keshani testified about his November 23, 2010 meeting with Mr. McCollum, in which they discussed the list of 15 unresolved items. Mr. McCollum told him that, in order to put a toe kick in the Cinema 10 concession stand, he would have to remove the concession stand from the theater premises. At the conclusion of the meeting, Mr. Keshani perceived that Mr. McCollum took a picture of Mr. Keshani with his cell phone. When Mr. Keshani asked him what he was doing, Mr. McCollum replied, "Well, you'll find out.... [M]aybe you'll never find out, you'll never be around to find out or something like that." Mr. Keshani took that as a threat.

After the November 2010 meeting, Mr. Keshani said, neither Mr. McCollum nor his employees came back to the Cinema 10 project. The next communication Mr. Keshani received was the December 2010 letter from Mr. McCollum's attorney demanding payment.

*Id.* at *3–*5.

After Mr. Keshani's testimony, he called construction expert George Bedocs to testify.[2] Mr. Bedocs testified that he had viewed Mr. McCollum's cabinetry work at Cinema 10. *Id.* at *5. He generally corroborated Mr. Keshani's testimony that all of the 15 items on the Exhibit 21 list needed to be completed. Mr. Bedocs estimated that it would cost approximately $17,050.00 to complete or repair these items. He did not, however, break out the cost of adding a toe kick to the front part of the concession stand, but he stated that the cost of this repair comprised most of the total $17,050.00 amount. *Id.* at *5–*6. He further opined that Mr. McCollum's work at Cinema 10 did not conform to industry standards in the community. *Id.* at *6.

Thereafter,

Mr. McCollum testified on his own behalf. He conceded that time was of the essence on the cabinetry work for the Cinema 10, as stated in the parties' contract. He claimed, however, that completion of the cabinetry for the movie theater was delayed by some of Mr. Keshani's changes, and he said that he did not always have all of the necessary information from Mr. Keshani. Mr. McCollum also said generally that the work of some of the other trades in the Cinema 10 delayed completion of the cabinets; he did not specify dates or estimate the amount of delay caused by others.

---

[2] Mr. Bedocs was tendered as an expert in construction, but not cabinetry.

Mr. McCollum said that, once Mr. Keshani decided that he only wanted to interface with Mr. McCollum by email, it became difficult for them to communicate because Mr. McCollum was rarely at his computer. When he did speak to Mr. Keshani, Mr. McCollum testified, he assured Mr. Keshani that he was willing to resolve the 15 items on Mr. Keshani's list. Initially, Mr. McCollum said that Mr. Keshani would not let him on the Cinema 10 property to complete the 15 unresolved items. Later in his testimony, Mr. McCollum clarified that Mr. Keshani allowed him on the theater property during the project, but after the November 23, 2010 meeting, Mr. McCollum's attorney advised him not to go back to the project site. Mr. McCollum denied Mr. Keshani's claim that he threatened Mr. Keshani at the November 23, 2010 meeting, and added that Mr. Keshani was paranoid.

Mr. McCollum maintained that toe kicks are not standard for all types of cabinetry. However, he acknowledged in his testimony that he was obligated to resolve the 15 items listed in Mr. Keshani's email and had agreed to do so. He also conceded that, by the time of his November 23, 2010 meeting with Mr. Keshani, the 14 other items on the list were not completed. After discussing what he would need to do to fix or complete the other items listed in Mr. Keshani's email, Mr. McCollum said that it would cost him "around $1200" in labor to resolve those items.

*Id.* at *6.

At the conclusion of the trial, the trial court orally ruled in favor of Mr. McCollum, finding

> that the Cinema 10 movie theater did not open until October 1, 2010, and that the delay in opening was "caused by a . . . number of reasons. [The delays] were caused by the plans being incomplete, by the weather, according to the Plaintiff, by actions or inactions of other subcontractors, and to some degree by the Plaintiffs." It found that Mr. McCollum's fault in the delays "was minimal in the Court's opinion, thus, the Court finds that the Defendant did not breach the contract by failing to timely fulfill his obligations under the contract." The trial court held that Mr. McCollum "has substantially complied with the contract and has not breached the contract."

9

The trial court also noted that the 15 items set forth in Exhibit 21 "have not been repaired for the most part." Referring to items 1 through 14 on Exhibit 21, the trial court found, "the problems can be repaired or fixed in a short time frame and at a relatively small cost." It found specifically that, as of the time of trial, the repairs had not been made to these items "because of disagreement between the parties." As to the last item on the list, the toe kick, the trial court held that Mr. McCollum "did not breach the contract by failure to install the toe kick as he was not required to do so under the contract."

The trial court then awarded damages to Mr. McCollum. It observed that Mr. Keshani had "not presented a precise amount for repair or correction of Items 1 through 14," and that Mr. McCollum's estimate for the repair of those 14 items was $1,200. Based on this, the trial court awarded Mr. McCollum damages in the amount he requested, $24,463 less the $1,200 he estimated it would cost him to resolve items 1 through 14, for a total award of $23,263. The trial court also awarded prejudgment interest to Mr. McCollum at a rate of 10% from December 24, 2010, the deadline Mr. McCollum had established for payment in his December 2010 demand letter to Mr. Keshani.

*Id.* at *6–*7. The trial court entered its written order on May 22, 2013. The written order did not incorporate the earlier oral ruling by reference, nor did it recount any of the trial court's oral findings. The May 22, 2013, written order only provides the following:

> The Court finds that McCollum performed the contract in accordance with the agreement of the parties and did not breach the contract. The Court finds that Anil [Construction] breached the contract by failing to pay the balance of the contract price owed to McCollum in the amount of $23,263.00.

> The trial court ordered Anil Construction to pay Mr. McCollum damages in the amount of $23,263, plus prejudgment interest "from and after the date of December 24, 2010...." . . . .

*Id.* at *6.

10

On June 19, 2013, Anil Construction appealed the trial court's final judgment to this Court. This Court issued an order on October 1, 2013, stating that the trial court's May 22, 2013, was not a final appealable order because it did not dispose of Mr. McCollum's counterclaim, his request for attorney fees, or his motion for an award of discretionary costs. Consequently, on October 7, 2013, the trial court entered a Supplemental Final Judgment rejecting Mr. McCollum's counterclaim for attorney fees and expenses. Upon entry of the Supplemental Final Judgment, this Court proceeded to review the merits of the appeal in *Anil Construction I*.

However, this Court concluded that the trial court's findings of fact and conclusions of law were insufficient. Specifically, we instructed the trial court "to issue detailed findings of fact and conclusions of law to both the complaint and the counter-complaint, and to address each party's affirmative defenses." *Id.* at *12.

Pursuant to this directive, the trial court entered an Amended Judgment on August 26, 2014. In the Amended Judgment, the trial court found that the subcontract stated that "it was a 'turn key' job, but [the subcontract] did not define that term." The trial court then provided a dictionary definition for the term "turn key," and determined that Anil had breached the contract by refusing to pay McCollum. The Amended Judgment provides:

> Shortly after the theater opened, Anil raised several items to McCollum that it contended needed to be repaired or completed. Over the next two months, McCollum performed additional services in an effort to address Anil's complaints; however, Anil persisted in its claims that the contracted work was incomplete and not performed in a workman-like manner. Ultimately, McCollum's counsel sent Anil a letter dated December 3, 2010 demanding that the remaining balance due under the contract be paid no later than December 24, 2010.

The trial court determined that, although construction was undisputedly delayed, the delay was not solely the fault of Mr. McCollum. Instead, the trial court found that unfavorable weather, the delays of other subcontractors, and Mr. Keshani's many requests caused much of the delay. Thus, the trial court found that Mr. McCollum did not breach the contract by failing to timely complete his obligations.

The trial court next addressed Anil Construction's claim that Mr. McCollum's work was defective or otherwise unworkman-like. Although Anil Construction contended that Items 1 through 14 required repairs by Mr. McCollum, and Mr. McCollum agreed, the trial court found that Mr. McCollum substantially complied with the contract and that he did not have an opportunity to fix these items because he was refused access to the premises. Further, regarding Item 15, the toe kick, the trial court found that Mr. McCollum did not breach the contract by failing to install the toe kick in the front side of

11

the concession stand because the contract did not require him to do so. The trial court noted that the parties also entered into a modification of their original contract, which changed the scope of Mr. McCollum's work. The modifications resulted in an increased remaining balance of $24,496.33 (half of original contract price of $22,325.00 plus $2,171.33 for additional work) that Anil Construction agreed to pay Mr. McCollum. Despite the modification to the subcontract, the trial court found that Mr. McCollum had substantially completed his contractual obligations. However, because Mr. McCollum estimated $1,200.00 to complete or repair Items 1 through 14, the trial court found that the judgment in favor of Mr. McCollum should be set off in the amount of $1,200.00.

On September 25, 2014, Anil Construction appealed the trial court's Amended Judgment.[3]

## Issues

Anil Construction raises two issues on appeal, which are taken from its brief:

> [1.] Whether the Trial Court erred by failing to issue detailed findings of fact and conclusions of law as to all claims, counterclaims and affirmative defenses in the Amended Judgment as rendered subsequent to remand.

> [2.] Whether the preponderance of the evidence supports the conclusions set forth in the Amended Judgment.

## Standard of Review

The trial court heard this case sitting without a jury. Accordingly, we review the trial court's findings of fact de novo with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). No presumption of correctness, however, attaches to the trial court's conclusions of law and our review is *de novo*. **Blair v. Brownson**, 197 S.W.3d 681, 684 (Tenn. 2006) (citing **Bowden v. Ward**, 27 S.W.3d 913, 916 (Tenn. 2000)).

Additionally, the trial court's findings on credibility, whether express or implicit, are entitled to great deference on appeal. *See* **Taylor v. McKinnie**, No. W2007–01468–COA–R3–JV, 2008 WL 2971767, at *4 (Tenn. Ct. App. Aug. 5, 2008). Where the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary. **Franklin Cnty. Bd. of Educ. v. Crabtree**, 337 S.W.3d 808, 811 (Tenn. Ct. App. 2010) (citing **Jones v. Garrett**, 92 S.W.3d 835, 838 (Tenn. 2002)).

---

[3] This Court entered an Order consolidating the record from *Anil Construction I* with the record from the instant appeal on November 24, 2014.

## Discussion

### Rule 52.01 Findings of Fact and Conclusions of Law

We begin with Anil Construction's argument that the trial court erred by failing to comply with this Court's directive in *Anil Construction I* to make sufficient findings of fact and conclusions of law. Specifically, we instructed the trial court to make findings of facts and conclusions of law as to both the complaint and counter-complaint, and to address each party's affirmative defenses." *Anil Construction I*, at *12. Anil Construction alleges several deficiencies with respect to the trial court's order, including: (1) that the trial court failed to address the parties' modifications to the contract, (2) that the trial court failed to address Anil Construction's affirmative defenses of set-off, recoupment, and duress, (3) that the trial court failed to explain how the contract should be interpreted, and (4) that the trial court failed to address the issues of breach and material breach.

Before we can address Anil Construction's concern, some background on Rule 52.01 findings of facts and conclusions of law is helpful. Effective July 1, 2009, Rule 52.01 of the Tennessee Rules of Civil Procedure provides:

> In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment. . . . If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rules 41.02 and 65.04(6).

Tenn. R. Civ. P. 52.01 (emphasis added).[4] This Court has previously held that the requirement to make findings of fact and conclusions of law is "not a mere technicality." *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009).

Instead, the requirement serves the important purpose of "facilitat[ing] appellate review and promot[ing] the just and speedy resolution of appeals." *Id.*; *White v. Moody*, 171 S.W.3d 187, 191 (Tenn. Ct. App. 2004); *Bruce v. Bruce*, 801 S.W.2d 102, 104 (Tenn. Ct. App. 1990). The Tennessee Supreme Court recently explained that Rule 52.01 findings and conclusions serve three important purposes:

---

[4] Prior to July 1, 2009, trial courts were only required to make specific findings of fact and conclusions of law "upon request made by any party prior to the entry of judgment." *See Poole v. Union Planters Bank N.A.*, No. W2009-01507-COA-R3-CV, 337 S.W.3d 771, 791 (Tenn. Ct. App. 2010) (noting the amendment). However, the current version of Rule 52.01 requires the court to make these findings regardless of a request by either party. *Id.*

13

First, findings and conclusions facilitate appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision. *See Estate of Bucy v. McElroy*, No. W2012-02317-COA-R3-CV, 2013 WL 1798911, at \*3–4 (Tenn. Ct. App. Apr. 26, 2013) (noting that the Rule 52.01 requirement facilitates appellate review); *Hardin v. Hardin*, No. W2012-00273-COA-R3-CV, 2012 WL 6727533, at \*5 (Tenn. Ct. App. Dec. 27, 2012) (same); *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at \*8 (Tenn. Ct. App. May 15, 2009) (recognizing that without findings and conclusions appellate courts are left to wonder about the basis of a trial court's decision); *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at \*19 (Tenn. Ct. App. Apr. 21, 2004 (same); 9C [Charles A. Wright et al.,] *Federal Practice and Procedure* § 2571, at 219 [(3d ed. 2005)] [hereinafter 9C *Federal Practice and Procedure*] (recognizing that specific findings by the trial court facilitate appellate review). Second, findings and conclusions also serve "to make definite precisely what is being decided by the case in order to apply the doctrines of estoppel and res judicata in future cases and promote confidence in the trial judge's decision-making." 9C *Federal Practice and Procedure* § 2571, at 221–22. A third function served by the requirement is "to evoke care on the part of the trial judge in ascertaining and applying the facts." *Id.* at 222. Indeed, by clearly expressing the reasons for its decision, the trial court may well decrease the likelihood of an appeal. *Hardin*, 2012 WL 6727533, at \*5.

*Lovelace v. Copley*, 418 S.W.3d 1, 34–35 (Tenn. 2013). "Without such findings and conclusions, this court is left to wonder on what basis the court reached its ultimate decision." *In re K.H.*, 2009 WL 1362314, at \*8 (quoting *In re M.E.W.*, No. M2003-01739-COA-R3-PT, 2004 WL 865840, at \*19 (Tenn. Ct. App. Apr. 21, 2004)).

Rule 52.01 findings are particularly important in cases involving construction contracts. *See generally Lake v. Haynes*, No. W2010–00294–COA–R3–CV, 2011 WL 2361563 (Tenn. Ct. App. June 9, 2011). In *Lake*, the court remanded the case for findings of fact and conclusions of law, stating that

construction cases rarely lend themselves to a global finding that one party or the other was entirely at fault; frequently the quality of the construction may be in compliance with the applicable standards in some respects but not in others, and

14

the oral communications over the course of the construction can lead to an array of misunderstandings and differing accounts of events.

*Lake*, 2011 WL 2361563, at *5. Similarly, in ***John Allen Construction, LLC v. Hancock***, No. W2004-02920-COA-R3-CV, 2006 WL 473732 (Tenn. Ct. App. Mar. 1, 2006), this Court remanded a case based on several deficiencies in the trial court's order:

> Neither the voluminous transcript nor the technical record include any explanation of the trial court's determinations of credibility, its factual findings on the numerous allegations of material breaches or substantial defects in the construction, its factual findings on the necessity of remedial measures or amounts expended to complete the construction or address various alleged problems with the structural integrity of the home. There are no factual findings on the issues regarding the status of John Allen Construction's license or the ramifications of any such licensing issues, and no factual findings regarding the alleged "cap" in the contract price to which the parties purportedly agreed. We note that the final order states that John Allen Construction is "due an unpaid bill" from the Hancocks "in the amount of $71,092.00," and that this amount correlates with the amount sought by John Allen Construction in its original complaint. Apart from that, it is not possible to discern the basis on which the trial court calculated its award of damages.

*Id.* at *5 (emphasis added). The ***John Allen*** Court found that it was left with little choice but to vacate the trial court's judgment and remand the case for findings of fact and conclusions of law sufficient for the appellate court to review the calculation of damages and other issues raised on appeal by both parties. *Id.* at *6. With the foregoing guidance in mind, we address Anil Construction's alleged deficiencies in the trial court's order.

We have thoroughly reviewed the trial court's Amended Judgment in this case and Anil Construction's argument regarding its perceived deficiencies. Although the Amended Judgment is not as detailed as Anil Construction would prefer, our review demonstrates that the findings of fact and conclusions of law in the Amended Judgment are sufficient to facilitate appellate review. To this end, we turn to the language in the Amended Judgment.

We begin with the findings of fact and conclusions of law in the Amended Judgment as they pertain to breach. The trial court specifically found that Mr. McCollum did not breach the original contract or its subsequent modifications for any alleged failure

15

to timely complete his work because "the delays were caused by a number of reasons. They were caused by the plans being incomplete, by the weather, by actions or inactions of other subcontractors, and by [Anil Construction]." Notably, the trial court's order included specific credibility findings regarding Mr. Keshani's testimony. To this end, the trial court stated that it found that Mr. Keshani was not a credible witness and rejected his testimony. Although the trial court did not explicitly state it did not credit Mr. Keshani's testimony concerning external delays, we can infer that the trial court did not believe his testimony because the trial court rejected the testimony as a whole. The record is devoid of any clear and convincing evidence demonstrating why the trial court erred in its credibility finding; and thus, we will not reevaluate its credibility assessment. *Franklin Cnty. Bd. of Educ.*, 337 S.W.3d at 811. Additionally, the trial court concluded that Mr. McCollum did not breach the contract for any allegedly defective work, explaining that Cinema 10 had been operating with the defects and that Mr. McCollum was prohibited from entering the premises.

The trial court's order also addresses the toe kick, listed as Item 15 on Mr. Keshani's email to Mr. McCollum. The trial court found that, "Neither the contract nor the plans called for the installation of a toe kick at this place." Accordingly, the trial court found that Mr. McCollum did not breach the contract by failing to install one because he was not required to do so under the contract or any subsequent modification. We further note that George Bedocs, the construction expert, opined that it would cost approximately $17,050.00 to repair or complete Items 1 through 15. However, he also testified that the cost to add the toe kick comprised most of his $17,050.00 estimate, but he did not break out the cost of adding the toe kick. Thus, he did not offer a clear estimate as to the repair or completion of only Items 1 through 14. As evidenced in the Amended Judgment, the trial court, accordingly, rejected Mr. Bedocs' testimony because it did not include an estimate pertaining to only Items 1 through 14, the only items the trial court found Mr. McCollum was obligated to correct. The trial court credited Mr. McCollum's estimate of $1,200.00 to repair Items 1 through 14.

We next turn to the trial court's calculation of damages. The trial court's order states that Anil Construction promised to pay Mr. McCollum $44,650.00 total—one-half due when the parties entered the contract and one-half due upon Mr. McCollum's completion of the work. Thus, at the time of trial, the court found that $22,325.00 of the original contract price was still owed to Mr. McCollum. However, the trial court notes that the modifications altered both Mr. McCollum and Anil Construction's obligations: "[S]everal changes were made to the scope of McCollum's work and the parties agreed that these changes increased the remaining balance to $24,296.33." Still, the trial court found that, because Mr. McCollum had substantially complied with the original contract and its modifications, Anil Construction's failure to issue payment resulted in a breach. Accordingly, the trial court awarded damages in the remaining contractual amount of $24,263.00 less the $1,200.00 that Mr. McCollum estimated to complete Items 1 through 14. Thus, the reduction of the judgment in favor of Mr. McCollum by $1,200.00

addresses the affirmative defenses of set-off and recoupment. In reaching this number, the trial court specifically found that "Anil [Construction] has not presented a precise amount for repair or correction of Items 1 through 14. McCollum's estimate was $1,200.00." Further, as previously stated, the trial court simply did not credit the entirety of Mr. Keshani's testimony, which includes his testimony as to any damages he was entitled to recoup.[5]

With regard to Anil Construction's affirmative defenses of unclean hands and duress, the trial court's credibility findings sufficiently address those issues. The majority of the evidence presented regarding the affirmative defenses came through the testimony of Mr. Keshani, which the trial court did not credit. From the trial court's order, we can discern that the trial court simply did not credit Mr. Keshani's allegations that Mr. McCollum had threatened him. Accordingly, bearing in mind that the order must be sufficient to facilitate appellate review, we must conclude that the trial court has adequately addressed Anil Construction's affirmative defenses through its credibility findings of Mr. Keshani.

Based on the foregoing, we conclude that the trial court's findings of fact and conclusions of law within its Amended Judgment are sufficient.

Preponderance of the Evidence

The second aspect of Anil Construction's argument on appeal concerns whether the evidence preponderates against the trial court's findings and conclusions in its Amended Judgment. Because this case was tried by the court, sitting without a jury, we review the factual issues de novo upon the record with a presumption of correctness. Tenn. R. App. P. 13(d). Unless the evidence preponderates against the trial court's findings, we must affirm, absent error of law. *Id.* In order for the evidence to preponderate against the trial court's findings, it must support another finding of fact with

---

[5] The testimony on Anil Construction's damages requires some clarification. In its complaint, Anil Construction states that it is seeking damages in an amount to be proven at trial. Mr. Keshani testified briefly about his lost profits from the concessions stand because of the delays. The trial court asked counsel for Anil Construction whether it was seeking damages relating to lost revenues. Counsel stated,

> With respect to lost profit analysis, no, Your Honor, we're not here to tell - - talk about lost profits. What we are saying, the job was delayed, he lost revenues as a result of those delays. But as far as the lost profits, that's not what we're here to do.

In other words, Anil Construction only sought damages stemming directly from the breach of contract, but it did not seek consequential damages. Despite seeking damages only for damages stemming from the alleged breach, Anil Construction failed to provide a definite amount of the cost to fix Items 1 through 14, either through his own testimony or his expert's testimony.

greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000).

Anil Construction argues that the preponderance of the evidence does not support the findings and conclusions in the Amended Judgment. Specifically, Anil Construction argues that the preponderance of the evidence demonstrates that Mr. McCollum was the first to breach the contract, and therefore, should not be able to recover damages. Anil Construction contends that it repeatedly put Mr. McCollum on notice of the alleged defective work and gave him an opportunity to fix it. Accordingly, it contends that Mr. McCollum breached the parties' contract when he "voluntarily cho[]se not to complete his work."

For its argument, Anil Construction relies on *McClain v. Kimbrough Construction Co.*, 806 S.W.2d 194 (Tenn. Ct. App. 1990). *McClain* involved a construction contract between a general contractor and a brick mason. The brick mason sued the general contractor, alleging breach of contract because the general contractor unilaterally terminated the contract before the work was complete. The brick mason sought to recover its lost profits. The general contractor counterclaimed, alleging that the brick mason's work was defective. *Id.* at 196.

In analyzing the parties' claims that each other's conduct amounted to a material breach, *McClain* Court addressed the factors to consider when determining whether a party's failure to perform is material:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id.* at 199 (citing Restatement (Second) of Contracts § 241 (1979)). Applying the above factors, the court in *McClain* determined that the deficiencies in the brick mason's work were not material. Ultimately, the trial court found in favor of the brick mason, and we affirmed. The *McClain* Court held that the general contractor "had a duty to give [the brick mason] notice and a reasonable opportunity to correct its defective work before terminating the contract. [The general contractor's] failure to give [the brick mason]

18

notice constitutes a material breach." *Id.* at 198–99. Thus, the general contractor had an obligation to put the brick mason on notice of the alleged defects and permit the brick mason an opportunity to correct them. Accordingly, the general contractor was the breaching party. Anil Construction contends that, because it put Mr. McCollum on notice of the alleged defects in his work, it did not breach the contract. Instead, it asserts that Mr. McCollum breached when he allegedly refused to correct his work.

On the contrary, Mr. McCollum asserts that the preponderance of the evidence supports the trial court's conclusion that he substantially complied with the contract and did not commit a material breach. Mr. McCollum's argument is two-fold. First, he asserts that did not breach the contract because the evidence demonstrates that a variety of factors, including Mr. Keshani's own actions, caused the delays in construction. Second, any alleged breach or defective work was not material because the defective items amounted to punch list items, which were easily remedied, and cannot form the basis of a material breach.

Upon a thorough review of the record, we cannot conclude that the evidence preponderates against the trial court's findings and conclusions concerning both breach and the materiality of breach. Regarding Anil Construction's assertions of allegedly untimely performance, the evidence does not preponderate against the trial court's finding that the cause of the delays was outside of Mr. McCollum's control.[6] We note again that the trial court simply did not credit Mr. Keshani's testimony, including his testimony concerning the delays. On the other hand, the testimony of Mr. McCollum clearly demonstrates that his work was delayed for various reasons, including Mr. Keshani's delay in providing information regarding the coloring of the cabinetry, Mr. Keshani's changes to the original plans, Mr. Keshani's failure to provide details regarding certain aspects of the project, and delays caused by other subcontractors. Thus, we cannot conclude that the evidence preponderates against the trial court's findings that Mr. McCollum did not breach the contract by failing to timely complete his work.

Further, regarding its argument that Mr. McCollum breached the contract based on allegedly defective workmanship, Anil Construction argues that Mr. McCollum essentially abandoned the project. It contends that the allegedly incomplete or defective items amounted to a material breach on behalf of Mr. McCollum. The items listed as allegedly incomplete or defective, Items 1 through 15, constitute a "punch list," and were referred to as a punch list by Mr. Keshani in his email to Mr. McCollum. Construction defects that constitute a punch list typically do not amount to a breach of contract. *Madden*, 315 S.W.3d at 825 ("We find no indication that Madden Phillips breached the contract with respect to the normal punch-list items discovered by Germantown during its

---

[6] Although we note that the contract contained a provision stating that time was of the essence, Tennessee law provides that a party to a contract may not terminate a contract and sue for breach when that party caused the delay of performance. *Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 818–19 (Tenn. Ct. App. 2009).

inspections."). Nothing in the record preponderates against the trial court's conclusion that Mr. McCollum substantially complied with the contract by installing the cabinets because the remaining items were merely punch list items that did not constitute a breach of the contract.

However, even assuming these punch list items did amount to a breach, such a breach was not material. This Court has stated that:

> [I]f the prior breach of such a contract was slight or minor, as opposed to material or substantial, the nonbreaching party is not relieved of his or her duty of performance, although he or she may recover damages for the breach. In what is essentially a variation on the above rule, some courts have indicated that a breach of contract which is only "partial," as opposed to "total," will not relieve the other party from his or her obligation to perform.

*Peoples Bank v. Lacy*, No. E2011-01489-COA-R3CV, 2012 WL 1664008, at *5 (Tenn. Ct. App. May 14, 2012) (citing 14 Williston on Contracts § 43:5). Here, the evidence at trial demonstrated that Cinema 10 was still able to open, albeit delayed, and operate as a movie theater. Notably, many of the allegedly defective items were in use at the time of trial, including the cabinetry. Further, according to the only testimony on this issue, Items 1 through 14 amounted to only approximately $1,200.00 in work to complete. Under the particular circumstances of this case, a punch list totaling $1,200.00 of unfinished work is not a material breach of contract worth more than $44,000.00. Pursuant to the reasoning in *Peoples Bank*, Anil Construction was not relieved of its contractual obligation to remit payment to Mr. McCollum, despite minor issues with his work, because the punch list items were not a material breach. Anil Construction, however, was entitled to recover damages from the breach by Mr. McCollum concerning Items 1 through 14. To this end, the trial court credited Mr. McCollum's testimony that it would cost approximately $1,200.00 to correct these items and deducted that amount from Mr. McCollum's total award. Accordingly, we cannot conclude that the evidence preponderates in favor of Anil Construction's argument that Mr. McCollum's breach was material and that it was entitled to forego payment of the remainder of the contract price.

## Conclusion

The judgment of the Madison County Chancery Court is affirmed, and this cause is remanded to the trial court for all further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are taxed to the appellant, Anil Construction, Inc., and its surety.

_____

J. STEVEN STAFFORD, JUDGE